**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

NICOLAS REYES,

     Plaintiff,

v.                                     Civil Action No. 3:18CV611

HAROLD CLARKE, et al.,

     Defendants.

### MEMORANDUM OPINION

Nicolas Reyes, a Virginia inmate proceeding with counsel filed this 42 U.S.C. § 1983 action. The matter is before the Court on Defendants' RULE 12 MOTION TO DISMISS. (ECF No. 15.) For the reasons set forth below the RULE 12 MOTION TO DISMISS (ECF No. 15) will be denied.

### I. STANDARD FOR A MOTION TO DISMISS

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff.

<u>Mylan Labs., Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir. 1993); see also <u>Martin</u>, 980 F.2d at 952. This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009).

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (second alteration in original). But this standard is not satisfied by complaints containing only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." <u>Id.</u> (citations omitted). Instead, a plaintiff must allege facts that are sufficient "to raise a right to relief above the speculative level," <u>id.</u> (citation omitted), stating a claim that is "plausible on its face," <u>id.</u> at 570, rather than merely "conceivable." <u>Id.</u> "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Bell Atl. Corp.</u>, 550 U.S. at 556). And, in order for a claim or complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to

state all the elements of [his or] her claim." Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir. 2002); Iodice v. United States, 289 F.3d 270, 281 (4th Cir. 2002)).

## II. SUMMARY OF ALLEGATIONS

At this stage of the proceedings, the factual allegations in the Complaint must be taken as true, unless they are conclusory, formulaic, or implausible. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In this case, the factual allegations in the Complaint are neither conclusory, formulaic, or implausible. Thus, they will be taken as true. All reasonable inferences are extended to Reyes.

### A. Reyes Generally

Reyes "is a 47-year-old native of El Salvador, who has been in the custody of the [Virginia Department of Corrections, ("VDOC")] since 2001. Reyes is a monolingual Spanish speaker, and is unable to read or write in any language." Compl. ¶ 16.[1] Reyes arrived at Red Onion State Prison ("Red Onion") in June of 2001

---

[1] The Complaint does not state the basis for Reyes's incarceration. However, a newspaper article written after the Complaint was filed, states that Reyes "was sentenced in Alexandria Circuit Court to a total of 47 years for the first-degree murder of his live-in girlfriend in 1991. He fled to Miami and was not arrested until 2000." https://www.richmond.com/news/local/crime/ mentally-ill-man-held-in-solitary-confinement-in-va-prison/ article_a9e280a6-677d-599a-a389-fc38795d0196.html (last visited July 23, 2019).

3

and remained there until July of 2003 when he was transferred to Wallens Ridge State Prison ("Wallens Ridge") and placed in the general population.  Id. ¶ 67.

On February 24, 2006, while at Wallens Ridge Reyes was assaulted by his cellmate.  Id. ¶ 68.  "Reyes was left bloodied and naked on the floor of his cell. He suffered broken teeth and a head injury."  Id.  Reyes was charged with assault by VDOC officials.  Id. ¶ 69.  "Following the assault [apparently in 2006], VDOC sent [] Reyes [back] to Red Onion and placed him in the long-term solitary confinement unit, where he remains to this day."  Id. ¶ 72.

## B.  Reyes's Confinement At Red Onion

### 1.  Red Onion:  The Facility And Confinement There

The "VDOC constructed Red Onion . . . as a 'supermax' prison . . . . '[A] totally locked down facility, where most offenders remain in the cell 23 hours a day, seven days a week.'"  Id. ¶¶ 53-54 (citation omitted).)  "The architectural design of Red Onion emphasizes isolation and total control. The segregation cells are isolating by design, featuring solid steel doors, wide distances separating cells opposite one another, and single occupancy recreation cages."  Id. ¶ 56.

> The only opportunity for prisoners in solitary confinement to communicate with one another is to speak to prisoners who share a ventilation opening.  The practice is called 'getting on the vent,' and in this way prisoners can speak to a maximum of three other

4

persons: the person in the cell directly beside his and the two men housed either directly above or below. Otherwise, prisoners may try to communicate silently with prisoners on the opposite side of the pod by standing at the narrow window in the door and making hand signals.

Id. ¶ 57.

## 2. Attempts To Move Reyes From Solitary Confinement Prior To The Institution Of The Step-Down Program

In May 2009,

VDOC deemed [] Reyes "not a threat to [Red Onion State Prison] or staff." VDOC promoted [] Reyes to Progressive Housing, a setting aimed ostensibly at helping people transition out of solitary confinement, for a brief period of roughly four months. However, when [] Reyes expressed fear of having another cellmate and refused to leave his cell, Defendants returned [] Reyes to the long-term solitary confinement unit.

Id. ¶ 92 (alteration in original). Reyes alleges that his refusal was a product of the paranoia that he developed from his years in isolation. Id. ¶ 93. Although "VDOC operates an entire unit for prisoners who 'express resistance to out of cell activities or a general population environment,' so as to 'reintegrate offenders into a general population setting in preparation for advancement to a lower security level,'" Reyes was not offered an opportunity move to that unit. Id. ¶ 93 (citation omitted).

Once again, in September of 2010, VDOC staff concluded that

Reyes [was] "not . . . a threat to the orderly operation of this institution." In October 2010, [] Reyes declined to move to Progressive Housing out of fear and paranoia. Instead of determining how best to reintegrate [] Reyes into general population after so many years of

5

solitary confinement, or assuring [] Reyes that he would not be forced to live with another cellmate who would assault him, <u>VDOC staff disciplined him for "disobeying an order"</u> and <u>he stayed in solitary confinement</u>.

<u>Id.</u> ¶ 94 (emphasis added) (punctuation corrected).

In July 2011, Reyes was again approved for release to Progressive Housing because the VDOC determined that Reyes was not a threat to the orderly operation of Red Onion. <u>Id.</u> ¶ 95. "Nevertheless, [Reyes] remained in solitary confinement. <u>Id.</u>

At Reyes's "August 2011 segregation review, VDOC staff decided that Reyes would remain in solitary confinement based solely on two disciplinary offenses: the assault charge from 2006 and the disobeying-an-order charge for refusing a move to progressive housing in 2010." <u>Id.</u> ¶ 97. Thereafter, at Reyes's regular 90-day segregation reviews, VDOC continued to keep Reyes in segregation based on the above infractions and/or "a subsequent disciplinary offense for failing to submit to a drug test when there was no indication that Reyes had used drugs or even understood the order to submit to a drug test." <u>Id.</u> ¶ 98.

C.    The Step-Down Program

"In 2011, VDOC began transitioning to the so-called "Step-Down or 'Pathways' Program" with the purported goal of providing a defined pathway for prisoners to transition out of long-term, indefinite solitary confinement. Under the Step-Down Program, there are two pathways [out of solitary confinement]: Intensive

6

Management (IM) and Special Management (SM)." Id. ¶ 58 (citation omitted). "Each pathway consists of privilege levels 0, 1, and 2." Id.

According to the VDOC's Step-Down Program "Operations Strategy" manual, the conditions for inmates at Level 0, the lowest level, were as follows for the SM pathway:

a.  One hour of recreation per day outside in recreation cages;
b.  Three showers per week;
c.  Two fifteen-minute phone calls per month;
d.  One one-hour non-contact visitation per week;
e.  No video visitation;
f.  No television;
g.  Shackled with dual escort whenever out of cell;
h.  No out-of-cell programming, law library access, or religious services;
i.  Limited commissary list with no food items for purchase.

Id. ¶ 63 (footnote omitted). The VDOC recently amended the policy to provide for two hours of recreation per day, five days a week. Id. ¶ 63 n.8. In order for an inmate to progress from Level 0, he must participate in the Step-Down Program. Id. ¶¶ 59-60. For inmates, such as Reyes, on the SM pathway, "[t]he basic Step-Down Program consists of seven English-language journals called 'the Challenge Series,' that purport to change the behavior and mindset of prisoners to improve their likelihood of success in general population. In-person instruction accompanies journals three through seven." Id. ¶ 61. Under the program, prisoners "such as

[] Reyes are entitled to progressively earn more privileges as they move through the program." Id. ¶ 76.

## 1. Reyes Was Allegedly Improperly Classified To The SM Pathway

Reyes has been designated to SM pathway, which is intended for prisoners who

> display an institutional adjustment history indicating <u>repeated disruptive behavior at lower level facilities</u>, a history of <u>fighting with staff or offenders</u>, and/or <u>violent resistance</u> towards a staff intervention resulting in harm to staff, other offenders without the intent to invoke serious harm or the intent to kill, or serious damage to the facility, <u>and</u> where <u>reasonable intervention at the lower security level have not been successful in eliminating disruptive behaviors</u>. Attachment A, O.P. 830.A.III.

Id. ¶ 73 (emphasis added). It is alleged that Reyes does not and never has met "the criteria for designation as an SM prisoner [and that] Reyes does not have an extensive history of violence within VDOC." Id. ¶ 74. Reyes's altercation, with his cellmate in 2006 is his only incident of violence, and the VDOC did not "attempt any 'reasonable intervention' to manage Reyes at lower security levels." Id.

## 2. Defendants' Alleged Failure To Properly Review And Advance Reyes's Out Of SM 0 Status

Although Reyes satisfied the behavioral prerequisites for progressing in the Step-Down Program on the SM pathway, as

> a non-English speaker, unable to read and write, and [with] mental health limitations, [] Reyes was unable <u>to participate in the journal series</u> component of the Step-Down Program, thereby making it <u>impossible for him to</u>

8

> progress out of solitary confinement without assistance
> or accommodations. And because of Red Onion
> correctional officers' hostility towards Spanish
> speakers and persons of Central American descent like []
> Reyes, such assistance and accommodation have been
> withheld.

Id. ¶ 64 (emphasis added). Reyes was not moved from SM 0 to SM 1 until June of 2018, seven years after the Step-Down Program began. Id. ¶ 65. According to Reyes, although the VDOC established procedures for reviewing an inmate's segregation or solitary confinement status, those reviews are essentially a sham. Id. ¶ 81. Reyes alleges that, "[a]lthough multiple levels of review ostensibly provide a veneer of procedure, they have operated instead as rubberstamps of one another and of [] Reyes'[s] indefinite solitary confinement." Id.

### (a)   The VDOC's Prescribed Review Procedures

"As an SM prisoner, [] Reyes is entitled to reviews of his segregation classification and progress through the Step-Down Program every 90 days by a designated staffer or staffers known as the Institutional Classification Authority (ICA)." Id. ¶ 77 (citing Attach. A). "The Building Management Committee, comprised of mental health and correctional staff with direct knowledge of the prisoners in their custody, is responsible for making recommendations to the ICA, including recommendations regarding assignment of prisoners to privilege levels (0, 1, or 2)." Id. ¶ 78.

9

The ICA reviews the progress of individual prisoners through the IM and SM pathways as well as their on-going segregation classification. For these segregation interim ICA reviews, a reporting staff member first makes a recommendation as to whether a prisoner should be retained in solitary confinement, and if so, at what privilege level (0, 1, or 2). On information and belief, this recommendation reflects the decision of the Building Management Committee. The ICA then reviews the staff recommendation internally before adopting it. All interim segregation reviews are also reviewed by the Facility Unit Head (currently Defendant Warden Kiser) or his designee.

Id. ¶ 79. Additionally, Reyes is

entitled to have his status in segregation reviewed by the Dual Treatment Team (DTT) and by the External Review Team (ERT). The DTT is responsible for reviewing solitary confinement classifications and making recommendations as to whether prisoners are properly classified. The DTT also reviews mental health assessments to determine appropriate housing. The ERT reviews prisoners bi-annually to determine if they are appropriately classified to segregation, if they continue to meet criteria for the SM pathway, and if the DTT has made appropriate decisions to advance the prisoner through the Step-Down Program.

Id. ¶ 80.

> (b) **The VDOC's Allegedly Ineffective Review Of The Necessity Of Maintaining Reyes In Solitary Confinement**

According to Reyes, the failure to provide translation

services renders the ICA review process a farce because:

[] Reyes does not receive Spanish-language notice of ICA hearings and recommendations before ICA segregation reviews occur, and so he has no meaningful opportunity to contest the basis for his ongoing solitary confinement.

ICA segregation reviews occur at prisoners' cell doors and consist of VDOC staff telling the prisoner the reporting staff's recommendation and asking for a

10

statement from the prisoner. VDOC staff do not offer translation services for [] Reyes during ICA segregation reviews. As such, [] Reyes does not understand the reporting officer's recommendation, nor can he provide a statement. He thus has no meaningful opportunity to communicate his readiness to transition out of solitary confinement to the ICA. Indeed, [] Reyes is not even aware when ICA reviews are occurring. Unbeknownst to [] Reyes, his inability to participate in his own ICA review has been routinely used to justify his continued solitary confinement, as Defendants have faulted him for refusing to participate.

. . . .

Moreover, the written decisions of the ICA are not translated into Spanish or communicated orally to [] Reyes so that he might understand them.

Despite the directive that "[i]t is valuable for Officers, Counselors, and the Unit Manager to communicate with each offender routinely on their [Step-Down] ratings," Attachment A, O.P. 830.A.IV.D.E.5.d, this is not done with [] Reyes.

For years Defendants denied [] Reyes the opportunity to progress out of solitary confinement on the sole ground that [] Reyes was not participating in the Step-Down Program. Yet the Step-Down Program was not made available to [] Reyes.

Id. ¶¶ 82-83, 85-87 (emphasis added) (alterations in original).[2]

Reyes further contends that the ERT and DTT provide "no meaningful review or oversight of the ICA's segregation retention decisions." Id. ¶¶ 88, 91. He alleges that:

Prisoners do not attend their ERT reviews and are not notified of ERT decisions. There is no right to appeal ERT decisions.

The DTT likewise fails to provide meaningful review or oversight of segregation decisions. Prisoners do not attend DTT reviews and are not aware when they occur. As with ERT reviews, prisoners cannot appeal decisions of the DTT or otherwise challenge them.

---

[2] The Court omits the internal paragraph numbers from all quotations.

Id. ¶¶ 90-91.

(c) **Reyes's Segregation Reviews Under The Step-Down Program**

The ICA assigned Reyes to the SM pathway at Level 0 in December of 2012. Id. ¶ 99. According to Reyes:

[e]very 90 days thereafter, ICA staff conducted pro forma reviews that relied primarily on [] Reyes' [s] supposed refusal to participate in the newly created Step-Down Program — a program that [] Reyes could not meaningfully participate in due to the lack of language access and his mental health disabilities — to justify his otherwise inexplicable retention in long-term solitary confinement.

Id. (emphasis added).

In February 2018, Reyes received a blue book. Id. ¶ 102.

Reyes does not understand what is in the book because it is in English, and he cannot read it. On information and belief, the blue book is part one of the Challenge Series that he must complete to leave solitary confinement. February 2018 was the first time [] Reyes received these course materials. At [] Reyes' [s] June 2018 ICA hearing, the ICA retained [] Reyes in solitary confinement, but moved him from SM 0 to SM 1 for the first time in six years, citing his participation in a Step-Down Program that he does not comprehend.

Id. (emphasis added).

It is alleged that, "[t]here is no penological purpose to [] Reyes' [s] retention in solitary confinement. During the twelve and a half years that [] Reyes has been in isolation, he has accrued just seven disciplinary reports — none of them involving incidents of violence. He has not had a disciplinary report of any kind in over three years." Id. ¶ 104.

12

## D. The Conditions Of Reyes's Confinement

Reyes's cell is six paces in length and three paces wide. Id. ¶ 107. The cell is "furnished with a steel bed, a steel table with no chair, and a steel toilet with a sink at the top. There is no mirror inside his cell. The fluorescent lights in his cell dim but do not turn off at night." Id. "There is a small, narrow window on the back wall of [] Reyes'[s] cell that has been darkened over so that he cannot see out of it. As such, the window does not relieve [] Reyes'[s] sensory deprivation." Id. ¶ 119. The door to Reyes's cell is solid steel "that masks all sound except the voices of those in the cells directly beside and below him. No Spanish-speaking prisoner is housed in a cell near enough for communication with [] Reyes. His isolation and lack of social interaction is nearly absolute." Id. ¶ 108.[3] "Due to [] Reyes'[s] solitary confinement, he cannot participate in congregate programming or employment, and he has no access to religious services. Until June 2018, he had no television inside his cell and no way to watch television." Id. ¶ 126.

The correctional officers treat Reyes with disdain because he is Latino, does not speak English, and has mental vulnerabilities. Id. ¶ 109. Correctional Officer regularly call Reyes and other

---

[3] Although Reyes contends that his cell door is solid steel, he also acknowledges that the door contains a window which he can use to gesture to the inmate across the hall from him. Compl. ¶ 57.

13

Latino prisoners "wetbacks" and Mexicans. Id. ¶ 110. Correctional

officers

> ridicule his language, and they use his inability to speak and understand English as an <u>excuse to not take []</u> <u>Reyes outside for recreation or to the shower</u>. Correctional officers understand that [] Reyes is unable to advocate for himself and that there will be no repercussions for their actions.

Id. ¶ 111 (emphasis added).

> Over the past several months, Defendants have begun taking [] Reyes out of his cell for what he believes are English lessons. Correctional officers escort [] Reyes in handcuffs and shackles to a small, individual cage. One other prisoner sits inside an identical small, individual cage nearby. The instructor of these classes speaks only in English. When [] Reyes attempts to communicate in Spanish, the instructor tells [] Reyes: "You're in our country, speak our language." [4
>
> [] Reyes believes that he is expected to learn English through this "class" so as to progress out of solitary confinement. On information and belief, [] Reyes is unknowingly participating in the Step-Down Program. He copies English words into the "Challenge Series" journals without understanding the words he is transcribing.
>
> At all other times, [] Reyes is confined to a cell roughly half the size of a parking space. He eats all meals in this small, confined space, which is also where he uses the toilet and sleeps.

Id. ¶¶ 128-30.

## 1. Food

It is alleged that Correctional officers:

> have routinely <u>deprived [] Reyes of meals</u>, including for a full day at a time. For the seven years that correctional staff relegated him to the most restrictive form of solitary confinement, []

---

[4] It is unclear how Reyes knows these alleged responses if he does not understand English.

> Reyes was categorically ineligible to work and earn
> money, and he was unable to purchase food items
> through commissary. When [] Reyes moved to SM 1 in
> June 2018, he became eligible for an in-unit
> job. SM 2 prisoners, however, have first priority
> for such assignments, and [] Reyes has not been
> assigned a job. His nutrition is dependent on the
> whims of the correctional officers who distribute
> food trays in his unit, and he often goes hungry.
> He has lost a substantial and unhealthy amount of
> weight while in solitary confinement due to
> Defendants' failure to provide adequate food.

Id. ¶ 113 (emphasis added). "Reyes entered solitary confinement
weighing 186 lbs. He has lost nearly 50 lbs. since that time, and
today weighs just 138 lbs." Id. ¶ 112.

### 2. Recreation

"For the majority of his time in isolation, VDOC policy
provided that solitary confinement prisoners received no more than
one hour of recreation five days a week. Recently, VDOC increased
the policy to provide two hours of recreation five days a week."
Id. ¶ 114 (citing Attach. C, O.P. 861.3.V.E.17.a (amended
1/16/2018)). Correctional officers, however, often fail to adhere
to these guidelines:

> In 2017, [] Reyes was taken out of his cell for
> recreation an estimated three times for the entire year.
> Now, [] Reyes goes outside for recreation roughly once
> every three-to-four weeks. For example, [] Reyes did
> not go outside for recreation once during the three-week
> period from on or about February 27 through on or about
> March 20, 2018 and again from on or about June 21 through
> on or about July 19, 2018.

Id. ¶ 115 (emphasis added).

15

"When [] Reyes does go outside, he is relegated to a narrow cage resembling a dog run, where he recreates alone." Id. ¶ 116. "Every time [] Reyes leaves his cell, including . . . [going] to the recreation cage, he must first submit to a cavity search." Id. ¶ 117. "While shackling [] Reyes, officers restrain him with a dog tether. If he moves in a way the officers find disobedient, correctional officers yank on the tether. [] Reyes finds the strip-search procedure humiliating and degrading." Id. "Correctional staff routinely apply handcuffs to [] Reyes'[s] wrists and ankles in a manner that is needlessly tight and that breaks the skin so as to cause him pain. This is a common practice at Red Onion that is used to dissuade prisoners from leaving their cells." Id. ¶ 118.

### 3. Showering

Under Defendants' policy, Reyes, as a segregation prisoner, is entitled to three showers per week. Id. ¶ 120. Nevertheless,

Reyes is routinely denied the opportunity to leave his cell to shower, with the result that he showers no more than once or twice a week and often far less. Correctional officers refuse to take him out for showers until the odor emanating from his cell becomes overwhelming. In 2017, [] Reyes showered only a handful of times over the course of the year. On information and belief, staff did not take him to shower during the month of August 2018.

Id. (emphasis added). Also, in July of 2018, correctional officers confiscated Reyes's medically prescribed dandruff shampoo. Id. ¶ 121.

16

### 4. Contact With Non-Incarcerated Individuals

As an SM 0 prisoner, Reyes was entitled to make two fifteen-minute phone calls per week. Id. ¶ 123. Since June of 2018, when he became a SM 1 prisoner, Reyes is entitled to make three fifteen-minute phone calls per week. Id. "In practice, he does not speak on the telephone with any family members, because staff have not provided meaningful instruction as to how to make outgoing calls." Id. The first telephone call Reyes had in ten years was when counsel for the present action called Reyes. Id. ¶ 124. Due to his isolation, Reyes has lost contact with his family. Id. ¶ 122. "Because correctional staff have denied him assistance writing to family, he has not corresponded with family since at least 2011, when he received a final letter from his sister." Id. "Defendants' solitary confinement policy mandates that [] Reyes not have contact or video visits with family, friends, or attorneys. He has not had a hug, handshake, or kindly human touch in twelve and a half years." Id. ¶ 125.

### 5. Ability To Reduce His Sentence With Good Conduct Allowance Credits

> Because [] Reyes is serving time for an offense that occurred before January 1, 1995, he is eligible for 30 days of good conduct allowance for every month he is in prison. See Attachment D, O.P. 830.3.VII.C. However, while he remains in solitary confinement, VDOC policy prohibits him from earning the maximum amount of good conduct time allowed. See id., O.P. 830.3.V.G.

Id. ¶ 127 (emphasis added).

**E. Defendants' Indifference To Reyes's Mental Decline**

"Upon entering VDOC in April 2001, mental health staff designated [] Reyes MH-0, the lowest of five mental health codes, indicating that he had no recent history of mental health treatment and no current behavior evidencing a need for services." Id. ¶ 133. During the year that Reyes spent in solitary confinement in 2001 and 2002, he "was twice placed on suicide precautions and exhibited unusual and bizarre behavior including hollering, screaming, and dancing around his cell. A mental health note from June 2002 reflects that [] Reyes'[s] condition necessitated psychotropic medication." Id. ¶ 134 (emphasis added).

In 2006, when Reyes was returned to Red Onion and again placed in solitary confinement, his mental health again deteriorated. Id. ¶ 136. In November of 2007, "Defendant Huff, a Qualified Mental Health Professional (QMHP), evaluated [] Reyes because he had not eaten in over eight days. Defendant Huff noted that [] Reyes appeared 'disheveled' and there was a strong smell of body odor emanating from his cell . . . ." and Reyes "was crying 'profusely.'" Id. ¶ 137. "Reyes also evidenced clear indicators of psychosis, 'making bizarre references to President Bush, the police, and making wide, arching military type salutes.'" Id. (emphasis added). "Defendant Huff deemed [] Reyes severely depressed and indicated that [] Reyes would be considered for referral to a mental health facility. [Nevertheless], Defendant

18

Huff did not follow up on this referral, and [] Reyes was not referred to a mental health facility. He spent one day on a suicide watch before being returned to solitary confinement." Id. ¶ 138 (emphasis added).

"Over the next decade, [] Reyes continued to exhibit indicators of a serious psychosis, but the mental health staff charged with his care failed to take reasonable measures to address his decline." Id. ¶ 139 (emphasis added). For example, in 2009, a mental health professional observed that Reyes

> was "constantly looking from side to side and nodding, as if responding to internal stimuli" and noted that he appeared "gaunt," as though he had not eaten in some time. She ascertained that [] Reyes was delusional and likely in need of acute treatment, as he "could continue to deteriorate if further interventions are not made." Despite these grave and prescient concerns, [] Reyes received no meaningful mental health treatment.

Id. ¶ 140 (emphasis added).

> In May of 2016, Trent, a Qualified Mental Health Professional,

> administered a "mini mental status examination." [] Reyes scored extremely poorly on this examination. Defendant Trent arbitrarily discarded [] Reyes'[s] results and attributed his poor performance to language limitations, even though an interpreter was present. Defendant Trent acknowledged a need to advocate on [] Reyes'[s] behalf with correctional staff regarding his inability to participate in programming and his need for support services. Either Defendant Trent failed to advocate on [] Reyes'[s] behalf or correctional staff refused to transfer [] Reyes from solitary confinement in response to Defendant Trent's advocacy. [] Reyes received no additional mental health treatment except for periodic wellness checks, and mental health staff continued to identify him as MH-0.

19

Id. ¶ 143. In November of 2016, Huff concluded that Reyes was not suffering from a serious mental illness ("SMI"). Id. ¶ 144. "Huff made this assessment without personally evaluating [] Reyes." Id.

> In the fall of 2017, VDOC began identifying SMI prisoners for possible diversion out of long-term segregation and into a Secure Diversionary Treatment Program (SDTP) at one of the institutions with special programming and individualized treatment services for SMI prisoners. Defendant Trent met with [] Reyes with the help of an interpreter to assess whether [] Reyes should be designated SMI. He found [] Reyes unkempt, suffering from possible psychosis, and unaware of "the building, town, and year." He diagnosed [] Reyes with severe cognitive deficits and found him severely functionally impaired. Defendant Trent re-classified [] Reyes as MH-2S, indicating that [] Reyes was suffering under a substantial impairment.

Id. ¶ 145 (emphasis added). Nevertheless, "[o]n January 19, 2018, [] Lee denied [] Reyes a transfer to an SDTP, stating that [] Reyes should be re-examined. [] Lee suggested that [] Reyes appeared more mentally ill than he was because of his inability to speak English." Id. ¶ 146. Lee requested that Huff re-evaluate Reyes. Id. ¶ 147.

During his evaluation on January 22, 2018, Reyes could not recall basic information, such as the name of the institution where he was incarcerated. Id. Huff determined that Reyes's "depression could be a result of his inability to communicate with others. [] Huff was unable to rule out delusional thinking." Id. ¶ 148

When Trent evaluated Reyes on January 23, 2018, "Reyes was exhibiting severely disordered, grandiose and delusional thinking.

20

He told Defendant Trent that he 'studied to be president of el Salvador, Guatemala, and Mexico.' [] Reyes was not oriented to person, time or situation." Id. ¶ 149.

On January 25, 2018, Reyes met with McDuffie, the Red Onion psychiatrist, for the first time. Id. ¶ 150. McDuffie diagnosed "Reyes with major depression, severe recurrent, and indicated that his mental disorder is an extreme impairment to functioning. . . . McDuffie prescribed Prozac, and would later prescribe Effexor, for [] Reyes'[s] depression and disordered thinking." Id. ¶ 150 (emphasis added). Thereafter, Huff

> reversed Defendant Trent's designation of [] Reyes as SMI. Defendant Huff did not identify [] Reyes as cognitively impaired, despite the fact that Defendant Huff had himself personally observed [] Reyes'[s] inability to recall basic facts. He acknowledged [] Reyes'[s] newly diagnosed depressive disorder, but in light of the new Prozac prescription, determined that [] Reyes no longer met the criteria for a functional impairment.

Id. ¶ 151. Reyes contends that "Huff's decision to rescind [] Reyes'[s] SMI designation was motivated in significant part by Defendant Lee's resistance to transferring [] Reyes out of solitary confinement and his calling [] Reyes'[s] SMI designation into question." Id. ¶ 152.

"As a result of the psychiatric medication he is taking, [] Reyes is increasingly lethargic and now sleeps during the day." Id. ¶ 153. "At other times, [] Reyes rants and raves inside his cell, sings gospel songs, and is the target of harassment and

21

malign neglect from correctional officers. He reports daily conversations with dead family members and influential political leaders, and he sees these individuals appear inside his cell." Id. ¶ 154.

## F. Alleged Acts And Omissions Of Defendants

### 1. Clarke

Clarke is the Commissioner of the VDOC and sets policy for the VDOC, including the long-term segregation policy at Red Onion. Id. ¶ 165. "[] Clarke also dictates the extremely harsh conditions of confinement for prisoners in long-term solitary confinement, including [] Reyes." Id. ¶ 167. "Despite his awareness that prisoners with language limitations, cognitive impairments, and serious mental health complications populate VDOC prisons and long-term solitary confinement units, [] Clarke has failed to accommodate such prisoners in VDOC's long-term solitary confinement policy." Id. ¶ 168.

### 2. Robinson

Robinson is the Chief of Corrections Operations for the VDOC. Id. ¶ 170. Robinson "is responsible for approving VDOC's long-term segregation policy and overseeing its implementation." Id. "The solitary confinement policy which [] Robinson oversees and for which he bears responsibility does not provide adequate safeguards for prisoners with [] Reyes'[s] limitations to progress out of solitary confinement." Id. ¶ 172.

22

### 3. Kiser And Barksdale

Jeffrey Kiser is the Warden of Red Onion.[5]  Id. ¶ 173. Barksdale was the Warden of Red Onion before Kiser.  Id. ¶ 178. Kiser and Barksdale failed "to ensure that limited English proficiency prisoners such as [] Reyes have adequate translation services."  Id. ¶¶ 173,178.  Kiser and Barksdale were and are "directly responsible for decisions removing prisoners from Level S (i.e., long-term segregation) classification to a less restrictive security level."  Id. ¶¶ 173, 178.

Kiser and Barksdale were and are "responsible for training correctional staff and for exercising oversight to ensure that [their] correctional officers perform their duties in a professional manner . . . ."  Id. ¶¶ 174, 179.  Despite receiving "numerous reports of correctional officers refusing to take prisoners in solitary confinement outside for recreation or to showers and of correctional officers giving prisoners empty food trays," Kiser and Barksdale took no steps to correct this misconduct.  Id. ¶¶ 174, 179.  In support of this allegation, Reyes notes that:

> [O]n September 13, 2017, another prisoner submitted an informal complaint on [] Reyes'[s] behalf alerting Defendant Kiser that [] Reyes had been denied access to showers and recreation for months at a time.  Defendant Kiser failed to take appropriate action in response to

---

[5] There are two defendants named Kiser.  Jeffrey Kiser and Justin Keyser.  This opinion will refer to Jeffrey Kiser simply as "Kiser" and Justin Kiser as "Justin Kiser."

this serious complaint and inappropriately ceded the responsibility for responding to the Unit Manager, who did not investigate the allegation.

On another occasion, May 23, 2017, a third party submitted an informal complaint alleging that officers refused to feed [] Reyes his lunch meal. Defendant Kiser failed to adequately investigate this serious allegation by failing to interview the officers involved and by failing to review surveillance footage.

Id. ¶¶ 175-76.

#### 4. Mathena

Mathena became Warden of Red Onion in 2011. Id. ¶ 180. As Warden, Mathena had the same failing as Barksdale and Kiser described above. Id. ¶¶ 180, 181.

Defendant Mathena currently works at VDOC headquarters as the head of Security Operations. As Security Operations Manager, he serves as the Chairman of the External Review Team. In this role, Defendant Mathena performs biannual reviews of each prisoner assigned to Red Onion at Security Level "S" (i.e., in solitary confinement) to determine if the prisoner should move out of solitary confinement. [] Reyes remains in solitary confinement due to Defendant Mathena's failure to perform a meaningful review of the necessity of [] Reyes' [s] continued isolation.

Id. ¶ 182.

#### 5. Gallihar

Defendant Gallihar is the Chief of Housing and Programs for Red Onion. Id. ¶ 183. "Defendant Gallihar has abdicated his responsibility as a member of the (DTT) to advise the Regional Operations Chief and Warden that [] Reyes does not meet the criteria for segregation." Id.

24

Defendant Gallihar also serves on the Building Management Committee and bears responsibility for the decisions of the Building Management Committee. In this role, Defendant Gallihar is responsible for assigning, or in the alternative, for recommending offenders to SM 0, SM 1, and SM 2 privilege levels and for discussing and preparing recommendations for the ICA and DTT. Defendant Gallihar has failed to meaningfully assess and review [] Reyes'[s] status, and so has caused [] Reyes to remain in segregation at the lowest privilege level for years.

Id. ¶ 184.

### 6. Duncan and Collins

Defendants Duncan and Collins performed Administrative Reviews of [] Reyes'[s] segregation ICA reviews. They abdicated their responsibility to perform meaningful reviews of [] Reyes'[s] continued placement in solitary confinement. At each 90-day review, they merely rubberstamped the recommendation of lower-level staff. Due to their failure to perform even a modicum of investigation or oversight into [] Reyes'[s] solitary confinement status, [] Reyes spent years in solitary confinement . . . .

Defendant Duncan is the former C-Building Unit Manager. Defendant Collins is the current C-Building Manager. As Unit Manager, Defendants Duncan and Collins are responsible for ensuring that the correctional officers in their unit perform their duties in a professional manner that follows correctional policy and that respects the inherent dignity of the incarcerated persons in their care. Despite numerous reports of correctional officers refusing to take prisoners on their units outside for recreation or to showers and giving prisoners empty food trays -- including reports specific to [] Reyes -- Defendants Duncan and Collins took no steps to correct this misconduct. By failing to take corrective action to ensure the correctional staff under their supervision provide prisoners appropriate care, Defendants Duncan and Collins all but ensured that mistreatment of the kind [] Reyes endured would occur.

Id. ¶¶ 185-86 (emphasis omitted).

### 7. Justin Kiser, Gilbert, Adams, and Lambert

Defendants Justin Kiser, Gilbert, Adams, and Lambert are or have been members of the ICA responsible for reviewing the continued segregation of [] Reyes during his time in solitary confinement. They have abdicated their responsibility to perform meaningful reviews of [] Reyes'[s] continued placement in solitary confinement. At each 90-day review, they merely retained [] Reyes in segregation at the lowest privilege level due to [] Reyes'[s] purported failure to participate in programming. Due to their insistence that [] Reyes complete the Step-Down Program journal series, [] Reyes spent years in solitary confinement in unconstitutional conditions and suffered lasting psychological damage.

Id. ¶ 188 (emphasis omitted).

### 8. Lee

Defendant Lee is a member of Central Classification Services. He is responsible for approving transfers out of long-term solitary confinement units for mental health reasons. Due to Defendant Lee's refusal to approve the transfer of [] Reyes to a residential mental health unit because of [] Reyes'[s] inability to speak English, [] Reyes continues to suffer in unconstitutional conditions in solitary confinement.

Id. ¶ 188 (emphasis omitted).

### 9. Huff, Trent, and McDuffie

Defendants Huff, Trent[,] and McDuffie are [] Reyes'[s] treating mental health professionals. They have failed to address the obvious primary cause of [] Reyes'[s] poor mental health: his unending solitary confinement. As qualified mental health professionals, Defendants Huff and Trent serve on the Building Management Committee and Dual Treatment Team, and are responsible for making recommendations and decisions regarding [] Reyes'[s] ongoing solitary confinement. Defendants Huff, Trent[,] and McDuffie also have failed to perform a comprehensive mental health evaluation of [] Reyes so as to render a meaningful diagnosis and develop a treatment plan.

26

Defendants' repeated failure to use translation services when communicating with [] Reyes places him at immense risk. Defendants Huff, Trent[,] and McDuffie refuse to designate [] Reyes as seriously mentally ill and functionally impaired, despite a long history of psychotic behavior evident in the medical record. As a result of Defendants' unconstitutional conduct, [] Reyes continues to suffer in unconstitutional conditions in solitary confinement, and his mental health will decline.

Id. ¶ 189.

### 10. Herrick

Defendant Herrick is the Director of Health Services for VDOC. He is responsible for ensuring that all VDOC prisoners, including [] Reyes, have adequate access to health services. On information and belief, Defendant Herrick has failed to institute a policy requiring that all mental health staff use interpretation services when communicating with limited English proficiency prisoners such as [] Reyes. Defendant Herrick is well aware that VDOC has limited English proficiency prisoners and that without interpretation services, there exists a significant and unacceptable risk that mental illness will go undiagnosed or misdiagnosed in this population. Defendant Herrick is also aware that long-term solitary confinement causes and exacerbates mental illness. Yet Defendant Herrick failed to ensure that mental health staff properly assess solitary confinement prisoners for decompensation and advocate for the removal of prisoners like [] Reyes who have decompensated in such conditions. As a result of Defendant Herrick's actions and omissions, [] Reyes continues to suffer in unconstitutional conditions in solitary confinement, and his mental health will decline.

Id. ¶ 190 (emphasis omitted).

27

### III. SUMMARY OF CLAIMS

Count I        Defendants violated Reyes's rights under the
               Eighth Amendment.

               (A)    Defendants' actions and omissions have
               caused Reyes to remain in solitary confinement
               for years.   Compl. ¶¶ 192-94.

               (B)    Defendants have failed adequately to
               supervise correctional officers who regularly
               deny Reyes access to outdoor recreation and
               showers.   Id. ¶ 195.

               (C)    Defendants Huff, Trent, and McDuffie
               exhibited deliberate indifference to Reyes by
                      (1) "failing to perform a comprehensive
               mental health evaluation at any point in []
               Reyes'[s] incarceration," id. ¶ 196;
                      (2) "failing to designate [] Reyes as
               seriously mentally ill and functionally
               impaired," id.;
                      (3) "failing to take steps to remove him
               from solitary confinement and abate conditions
               that are obviously detrimental to his mental
               health," id.; and,
                      (4) "failing to routinely communicate
               with [] Reyes through a Spanish-language
               interpreter," id..

Count II       Defendants Clarke, Robinson, Jeffrey Kiser,
               Barksdale, Mathena, Gallihar, Duncan,
               Collins, Justin Kiser, Gilbert, Adams,
               Lambert, and Lee violated Reyes's right to
               procedural due process under the Fourteenth
               Amendment by:

               (A) failing "to provide meaningful proceedings
               to determine the continued propriety or
               necessity of [] Reyes'[s] solitary
               confinement," id. ¶ 203; and,

               (B) interfering "with [] Reyes'[s] ability to
               progress through the Step-Down Program as
               provided in VDOC policy," id. ¶ 204.

28

Count III        In their official capacity, Defendants Clarke
                 and Kiser violated Reyes's rights under the
                 Americans with Disabilities Act ("ADA") by
                 failing to accommodate Reyes's mental
                 disabilities and denying him the benefits of
                 services because of these disabilities.  Id.
                 ¶¶ 207-215.

Count IV         In their official capacity, Defendants Clarke
                 and Kiser violated Reyes's rights under the
                 Rehabilitation Act of 1973 by failing to
                 accommodate Reyes's mental disabilities and
                 denying him the benefits of services because
                 of these disabilities.  Id. ¶¶ 216-224.

Count V          Defendants Clarke, Kiser Barksdale, Mathena,
                 Gallihar, Duncan, Collins, Justin Kiser,
                 Gilbert, Adams, and Lambert violated Reyes's
                 right to equal protection under the Fourteenth
                 Amendment.[6]

                 (A)   The above-named Defendants intentionally
                 discriminated against Reyes on account of his
                 national origin and limited English
                 proficiency "by failing to provide access to
                 translation services during mental health
                 assessments, segregation review hearings and
                 as part of the Step-Down Program, thereby
                 excluding [] Reyes from participation in and
                 denying him the benefits of VDOC services."
                 Id. ¶ 227.   "Defendants refused to allow []
                 Reyes to leave solitary confinement unless he
                 learned to read and write in English, i.e.,
                 his non-native language."  Id. ¶ 228.

                 (B)   "Defendants Clarke and Kiser are well
                 aware that correctional officers engage in
                 discriminatory treatment towards Latino
                 prisoners and prisoners from Central America,
                 yet they are deliberately indifferent to the
                 hostile environment that exists at Red Onion."
                 Id. ¶ 230.

---

[6] Reyes brings this claim against Defendant Clarke in his
official capacity, against Defendant Kiser in his official and
individual capacity, and against the remaining named Defendants in
their individual capacities.

Count VI          In their official capacities, Defendants
                  Clarke and Kiser violated Reyes's rights under
                  Title VI of the Civil Rights Act of 1964. Id.
                  ¶¶ 233-41.

## IV. ANALYSIS

### A. Eighth Amendment (Count I)

To state a legally sufficient Eighth Amendment claim, an inmate must set out facts plausibly alleging that: (1) when objectively viewed, the alleged deprivation or harm inflicted "was 'sufficiently serious,' and (2) subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008) (citing Wilson v. Seiter, 501 U.S. 294, 298-300 (1991)). "What must be [alleged] with regard to each component 'varies according to the nature of the alleged constitutional violation.'" Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996) (quoting Hudson v. McMillian, 503 U.S. 1, 5 (1992)).

When an inmate challenges his conditions of confinement, he must allege facts that plausibly show: "(1) a serious deprivation

of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Williams v. Griffin, 952 F.2d 820, 824 (4th Cir. 1991) (internal citation omitted) (citing Wilson, 501 U.S. at 301-03). Deliberate indifference requires the plaintiff to allege facts plausibly asserting that a particular defendant actually knew of, and disregarded, a substantial risk of serious harm to the plaintiff's person. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer, 511 U.S. at 837. Farmer teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." Quinones, 145 F.3d at 168 (citing Farmer, 511 U.S. at 837); see Rich v. Bruce, 129 F.3d 336, 338 (4th Cir. 1997) (stating same). Thus, to survive a motion to dismiss, the deliberate indifference standard requires a plaintiff to assert facts sufficient to form an inference that "the official in question subjectively

recognized a substantial risk of harm" and "that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) (quoting Rich, 129 F.3d at 340 n.2).

## 1. The Objective Component

Defendants point out that the United States Court of Appeals for the Fourth Circuit previously has rejected an Eighth Amendment claim by inmates who complained "that they are confined to their cells for twenty-three hours per day without radio or television, that they receive only five hours of exercise per week, and that they may not participate in prison work, school, or study programs." In re Long Term Admin. Segregration of Inmates Designated as Five Percenters, 174 F.3d 464, 471 (4th Cir. 1999) (hereinafter, "Mickle v. Moore"). In rejecting that claim, the Fourth Circuit observed that:

> the isolation inherent in administrative segregation or maximum custody is not itself constitutionally objectionable. Indeed, this court has noted that 'isolation from companionship, restriction on intellectual stimulation[,] and prolonged inactivity, inescapable accompaniments of segregated confinement, will not render [that] confinement unconstitutional absent other illegitimate deprivations.'

Id. at 472 (alterations in original) (citing Sweet v. S.C. Dep't of Corr., 529 F.2d 854, 861 (4th Cir. 1975)).

32

However, the Fourth Circuit recently reexamined when extreme isolation may satisfy the Eighth Amendment's objective component in a challenge by inmates to the conditions that existed on Virginia's death row in 2014. See Porter v. Clarke, 923 F.3d 348, 353-57 (4th Cir. 2019). The death row inmates' housing was similar to that described by Reyes at Red Onion.

Death row consists of two tiers, with each tier holding twenty-two cells and three showers. Each death row inmate is housed in a separate cell, and no inmates are housed in adjacent cells. Each cell is 71 square feet—approximately one-half the size of a parking space—and has a 10.5-foot-high ceiling. Cells contain a bed, a small desk adjacent to the bed, and a commode/sink combination. Each cell has a window that is 5 inches high by 41.5 inches long, which is covered by a wire mesh that allows natural light to pass through into the cell. Each cell's door is made of solid steel, includes a tray slot that is bolted shut when not in use, and a "rectangular in-set window that allow[s] inmates to look outside their cell into the pod."

Id. at 353 (alteration in original) (citations omitted). The governing procedures and regulations

allowed death row inmates one hour of outdoor recreation five days a week, and a ten-minute shower three days a week. During their outdoor recreation, inmates were confined to individual enclosures with concrete floors and enclosed by a steel and wire mesh cage. Each enclosure measured 7.9 feet wide by 20 feet long—approximately the size of a parking space—and 10 feet high. None of the enclosures had exercise equipment. Inmates could not simultaneously use adjacent recreation enclosures.
    Under the governing procedures and regulations, cells on death row were always lit: during the day, cells were illuminated by a main light mounted on the wall, and at night a low-level night light provided illumination for security and safety purposes. Inmates housed on death row could keep a television and compact disc player in their cell and borrow approved

33

publications and library materials to read. Additionally, inmates could request and use wireless telephones any day of the week between 8:00 a.m. and 9:30 p.m.

Id. 353-54 (internal citations omitted).

The limitations on human contact for the death row inmates also were very similar to the conditions described here by Reyes.

> The governing regulations and procedures allowed death row inmates to have noncontact visitation on weekends and state holidays. Inmates also could request contact visitation with immediate family members in "extreme circumstances" once every six months, which request the warden had unconstrained discretion to grant or deny. In practice, the warden would grant a request for contact visitation only when an inmate was approaching "death." Additionally, inmates had limited contact with prison staff. Corrections officers made rounds through the death row pod to perform security checks on inmates every thirty minutes and could—and sometimes would—speak with inmates to see if they needed assistance or had requests. Medical personnel and nurses also made rounds through the pod twice a day to provide inmates with medication. And death row inmates received visits from a mental-health practitioner at least once a week, and case counselors made rounds through the pod once a day.
> Two inmates housed on death row, Plaintiff Porter and former Plaintiff Ricky Gray, were allowed out of their cells to perform institutional jobs. "Other than these limited out-of-cell interactions, death row inmates were generally not permitted to leave their cells." "In particular, they were denied access to any form of congregate recreation, either indoor or outdoor; they were not allowed to eat meals outside of their cells; and they could not participate in congregate religious services or prison programming." Due to these restrictions, death row inmates spent between 23 and 24 hours per day in their cells.

Id. at 354 (footnote omitted) (citations omitted).

34

The Court of Appeals then explained that, "[i]n recent years, advances in our understanding of psychology and new empirical methods have allowed researchers to characterize and quantify the nature and severity of the adverse psychological effects attributable to prolonged placement of inmates in isolated conditions materially indistinguishable from the challenged conditions on Virginia's death row." Id. at 355.[7] Thereafter, the Court of Appeals held that, "[t]he challenged conditions of confinement on Virginia's death row—under which Plaintiffs spent, for years, between 23 and 24 hours a day 'alone, in a small . . . cell' with 'no access to congregate religious, educational, or social programming'—pose a 'substantial risk' of serious psychological and emotional harm." Id. at 357 (citation omitted). Given that the conditions alleged by Reyes are substantially analogous to the conditions that the Fourth Circuit found to violate the Eighth Amendment in Porter, Defendants are in error contending that Reyes has not alleged sufficient facts to support the objective element of an Eighth Amendment claim.

## 2. Deliberate Indifference

A plaintiff may demonstrate that a risk was so obvious that a prison official's failure to ameliorate it justifies an inference

---

[7] The panel in Porter relied upon this new research introduced by the death row inmates to explain why it was not bound by the earlier decision in Mickle v. Moore. Porter, 923 F.3d at 355-59.

of deliberate indifference. Id. at 361. "Put differently, '[a]n obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate.'" Id. (quoting Schaub v. VonWald, 638 F.3d 905, 915 (8th Cir. 2011)). In Porter, the Court of Appeals outlined several circumstances that supported an inference of deliberate indifference on the part of VDOC officials. Id. at 361-62. The Court said:

Corrections Department procedures barring detention of non-death row prisoners in segregated confinement—akin to the challenged conditions on death row—for longer than thirty consecutive days constitute unrebutted evidence of State Defendants' awareness that extended stays in segregation can have harmful emotional and psychological effects. . . .
    Additionally, the extensive scholarly literature describing and quantifying the adverse mental health effects of prolonged solitary confinement that has emerged in recent years provides circumstantial evidence that the risk of such harm was so obvious that it had to have been known.

Id. at 361 (citations omitted) (internal quotation marks omitted). Thereupon, the Court concluded that "[g]iven [State D]efendants' status as corrections professionals, it would defy logic to suggest that they were unaware of the potential harm that the lack of human interaction . . . could cause." Id. (alterations in original) (internal quotation marks omitted) (citation omitted). On the facts of Porter, the Fourth Circuit held that, if "a prison official lacks a legitimate penological justification for subjecting an inmate to a condition of confinement that poses a

36

substantial risk of serious harm—like prolonged solitary confinement, . . . then the official is presumptively acting with deliberate indifference to that risk." Id. at 362.

Reyes has alleged sufficient facts at this stage to plausibly assert that no legitimate penological justification exists for maintaining him in the prolonged solitary confinement alleged in the Complaint. That is especially so considering the allegations that he has not recently engaged in disruptive behavior. Accordingly, in light of the controlling authority from our Court of Appeals, and the fact that each Defendant is plausibly alleged personally to have played a significant role in maintaining Reyes in solitary confinement with knowledge of the deleterious effects thereof, Reyes adequately has stated a claim of deliberate indifference with respect to all Defendants.[8] Id.

However, evaluation of Reyes's deliberate indifference claim against Herrick requires further elaboration. Herrick is the Director of Health Services at VDOC. Reyes does not allege that Herrick personally reviewed or approved a decision to maintain

---

[8] The Court notes that Reyes has alleged a separate claim for deliberate indifference in the provision of mental health care against Defendants Huff, Trent, and McDuffie in Count I.C. At this stage, Reyes sufficiently alleges an Eighth Amendment claim against them because, inter alia, after learning of Reyes's deteriorating mental state they failed to remove him, or even to ask for his removal, to less restrictive and isolating conditions.

37

Reyes in solitary confinement. Instead, Herrick is alleged to have known:

> (1) of the serious psychological dangers posed by long-term solitary confinement. Compl. ¶ 190;
>
> (2) that VDOC has limited English proficiency prisoners;
>
> (3) that without interpretation services, there exists a significant and unacceptable risk that mental illness will go undiagnosed or misdiagnosed in this population; and
>
> (4) notwithstanding this extensive knowledge, Herrick failed to require mental health staff to use interpreters and "failed to ensure that mental health staff properly assess solitary confinement prisoners for decompensation and advocate for the removal of prisoners like [] Reyes who have decompensated in such conditions."

Id.

These allegations are sufficient to present a plausible claim that Herrick acted with deliberate indifference. See Valdez v. Danberg, 576 F. App'x 97, 100 (3d Cir. 2014) (observing that a supervisor may be liable where he or she "maintains a policy, practice or custom which directly causes a constitutional harm"); Clarkson v. Coughlin, 898 F. Supp. 1019, 1043 (S.D.N.Y. 1995) (concluding failure to provide interpretive services and assistive devices for deaf and hearing-impaired inmates during medical and mental health treatment amounted to deliberate indifference).

38

There is no doubt that Reyes has alleged serious medical conditions as to which Defendants were fully aware and indifferent. Accordingly, Defendants' Motion to Dismiss Count I will be denied.

**B.  Due Process (Count II)**

The Due Process Clause of the Fourteenth Amendment applies when government action deprives an individual of a legitimate liberty or property interest. Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 569 (1972). Thus, the first step in analyzing a procedural due process claim is to identify whether the alleged conduct affects a protected interest. Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997) (citing cases). A liberty interest may arise from the Constitution itself, or from state laws and policies. See Wilkinson v. Austin, 545 U.S. 209, 220-21 (2005).

"The Due Process Clause standing alone confers no liberty interest in freedom from state action taken 'within the sentence imposed.'" Sandin v. Conner, 515 U.S. 472, 480 (1995) (quoting Hewitt v. Helms, 459 U.S. 460, 468 (1983)). "[C]hanges in a prisoner[']s location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges [are] matters which every prisoner can anticipate [and which] are contemplated by his [or her] original sentence to prison . . . ." Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991). Thus, the federal Constitution does not

give rise to a liberty interest in avoiding segregation.  Id.
That, however, is not the end of the inquiry.

### 1.  State-Created Liberty Interests

Demonstrating the existence of a state-created liberty interest, requires a "two-part analysis." Prieto v. Clarke, 780 F.3d 245, 249 & n.3 (4th Cir. 2015) (quoting Tellier v. Fields, 280 F.3d 69, 80 (2d Cir. 2000)).  First, a plaintiff must make a threshold showing that the deprivation imposed amounts to an "atypical and significant hardship" or that it "inevitably affect[s] the duration of his sentence." Sandin, 515 U.S. at 484, 487 (1995); see Puranda v. Johnson, No. 3:08CV687, 2009 WL 3175629, at *4 (E.D. Va. Sept. 30, 2009) (citing cases).

If the nature of the deprivation that the plaintiff challenges meets either facet of that threshold, the plaintiff then must next adequately allege that Virginia's statutory or regulatory language "grants its inmates . . . a protected liberty interest" in remaining free from that deprivation. Puranda, 2009 WL 3175629, at *4 (alteration in original) (quoting Abed v. Armstrong, 209 F.3d 63, 66 (2d Cir. 2000)).  Defendants "assume, without conceding," that Virginia policy gives Reyes an expectation of avoiding confinement in segregated housing.  Mem. Supp. Mot. Dismiss 20.  Defendants contend that the Complaint does not satisfy the threshold requirements set forth by Sandin.

40

To make the Sandin threshold analysis, it is necessary first to "determine what the normative 'baseline' is: what constitutes the 'ordinary incidents of prison life' for this particular inmate?" Incumaa v. Stirling, 791 F.3d 517, 527 (4th Cir. 2015) (citing Prieto, 780 F.3d at 253). Then "with the baseline established, [the Court] determine[s] whether the prison conditions impose atypical and substantial hardship in relation to that norm." Id. (citing Prieto, 780 F.3d at 254). The United States Court of Appeals for the Fourth Circuit has observed that, "[a]lthough the general prison population is not the relevant atypicality baseline in all cases, it is the touchstone in cases where the inmate asserting a liberty interest was [initially] sentenced to confinement in the general population and later transferred to security detention." Id. at 528-29 (citing Prieto, 780 F.3d at 252). With that instruction in mind, it is appropriate to examine the conditions for an inmate in general population.

### 2. Comparison Of Conditions

General population inmates reside in dormitories or cells that permit communication between the inmates. Compl. ¶ 156. "Prisoners in general population share congregate meals in a dining area and recreate in large groups on the yard and in dayrooms" on a daily basis. Id. ¶¶ 157, 158. General population prisoners do not have limits on phone calls and are entitled to contact visits with family members and attorneys. Id. ¶ 159.

Additionally, general population prisoners have significantly more freedom and privileges than segregation inmates like Reyes. "General population prisoners are permitted to move about without shackles or restraints. There is no requirement that general population prisoners submit to a cavity search before leaving their cell." Id. ¶ 160. Unlike Reyes, "[g]eneral population prisoners also have access to vocational training and employment opportunities." Id. ¶ 162. Prisoners in general population do not have limits on the amounts of goods they may purchase from the commissary. Id. ¶ 164. Prisoners in general population, who committed their crimes between July 1, 1981 and January 1, 1995, may earn the maximum of thirty days of good conduct allowance for every thirty days served. Id. ¶ 163 (citation omitted).

The Complaint alleges conditions for Reyes that are enormously divergent from those to which persons in general population are subject. His conditions, as alleged, are more isolating and restrictive than those that apply to inmates in general population.

### 3. The Evolution Of The Atypical And Significant Hardship Standard

Sandin itself forecloses the notion that all forms of punitive or administrative segregation presumptively constitute an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484. In

42

Sandin, the Supreme Court rejected the plaintiff's claim that he enjoyed a liberty interest in avoiding confinement in punitive segregation for thirty (30) days. Id. at 487. The dissent observed:

> In the absence of the punishment, [the plaintiff], like other inmates in [the] general prison population would have left his cell and worked, taken classes, or mingled with others for eight hours each day. As a result of disciplinary segregation, however, [the plaintiff], for 30 days, had to spend his entire time alone in his cell (with the exception of 50 minutes each day on average for brief exercise and shower periods, during which he nonetheless remained isolated from other inmates and was constrained by leg irons and waist chains).

Id. at 494 (Breyer, J., dissenting) (citations omitted). However, the majority concluded that the conditions presented by Sandin "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." Sandin, 515 U.S. at 486 (emphasis added).

What constitutes an atypical and significant hardship under current precedent has become something of a moving target in the Fourth Circuit. In Beverati v. Smith, 120 F.3d 500 (4th Cir. 1997), the Fourth Circuit found that the inmate plaintiffs did not enjoy a liberty interest in avoiding a six-month stay in administrative segregation. In Beverati, the Fourth Circuit observed that "[t]he applicable prison regulations indicate that the conditions in administrative segregation are similar in most respects to those experienced by inmates in the general population

43

and that even those conditions that are more restrictive are not particularly onerous." Id. at 503. The plaintiffs, however, asserted "the actual conditions in administrative segregation are more onerous than those specified in the prison regulations." Id. at 504. As put by the Court of Appeals:

They claim that when they were initially placed in segregation, their cells were infested with vermin; were smeared with human feces and urine; and were flooded with water from a leak in the toilet on the floor above. And, they assert, they were forced to use their clothing and shampoo to clean the cells. In addition, inmates maintain that their cells were unbearably hot and that the food they received was cold. Furthermore, Van Aelst submitted an affidavit indicating that those assigned to administrative segregation did not receive clean clothing, linen, or bedding as often as required by the regulations governing administrative segregation; that they were permitted to leave their cells three to four times per week, rather than seven, and that no outside recreation was permitted; that there were no educational or religious services available; and that food was served in considerably smaller portions.

Id. The Fourth Circuit concluded that, "although the conditions were more burdensome than those imposed on the general prison population, they were not so atypical that exposure to them for six months imposed a significant hardship in relation to the ordinary incidents of prison life." Id.

Thereafter, in 2005, the Supreme Court held that confinement in Ohio's supermax prison, Ohio State Penitentiary ("OSP"), imposed "an atypical and significant hardship under any plausible baseline." Wilkinson v. Austin, 545 U.S. 209, 223 (2005). In reaching that conclusion, the Supreme Court noted that:

44

Conditions at OSP are more restrictive than any other form of incarceration in Ohio, including conditions on its death row or in its administrative control units. The latter are themselves a highly restrictive form of solitary confinement. In OSP almost every aspect of an inmate's life is controlled and monitored. Inmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day. A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline. During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells.

Incarceration at OSP is synonymous with extreme isolation. In contrast to any other Ohio prison, including any segregation unit, OSP cells have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates. All meals are taken alone in the inmate's cell instead of in a common eating area. Opportunities for visitation are rare and in all events are conducted through glass walls. It is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact.

Aside from the severity of the conditions, placement at OSP is for an indefinite period of time, limited only by an inmate's sentence. For an inmate serving a life sentence, there is no indication how long he may be incarcerated at OSP once assigned there. Inmates otherwise eligible for parole lose their eligibility while incarcerated at OSP.

Id. at 214-15 (citations omitted). Nevertheless, even after Wilkinson, the Fourth Circuit rejected an inmate's challenge to his continued confinement to solitary confinement and observed that, "[e]xtended stays on administrative segregation, however, do not ordinarily implicate a protected liberty interest." United

45

States v. Daniels, 222 F. App'x 341, 342 n.* (4th Cir. 2007) (citing Beverati, 120 F.3d at 502).

Then, in 2015, the Fourth Circuit concluded that the conditions on South Carolina's Special Management Unit ("SMU") pose an atypical and significant hardship. Incumaa, 791 F.3d at 529-32. In reaching that conclusion, the Court of Appeals explained that Wilkinson "emphasized three factors in its analysis: (1) the magnitude of confinement restrictions; (2) whether the administrative segregation is for an indefinite period; and (3) whether assignment to administrative segregation had any collateral consequences on the inmate's sentence." Id. at 530.

With respect to the first factor, the Court of Appeals noted "the SMU is substantially more restrictive than the general population." Id. at 521. Specifically, as a SMU inmate, the plaintiff was:

- confined to his cell 24 hours a day on non-recreation and non-shower days;
- permitted to leave his cell for recreation only one hour approximately ten times per month;
- allowed only a ten-minute shower three times per week;
- stripped [sic] searched, made to lift and shake his genitalia, made to bend over, spread his buttocks in the direction of the officer so that he may look at [plaintiff's] anus, then made to squat and cough, and afterwards hand cuffed behind his back every time he leaves the cell, even to the shower where he is locked in a single occupancy shower stall;
- served smaller portions of food than inmates in the general population receive;
- required to eat all meals in his cell;

46

- limited to property that can fit into a box that is 15 by 12 by 10 inches;
- denied all canteen privileges;
- denied education and vocational opportunities; and
- denied the opportunity to receive mental health treatment for his diagnosed mental health condition.

Id. at 521-22 (citation omitted) (internal quotation marks omitted). In concluding that, these conditions were atypical and imposed significant hardship, the Fourth Circuit emphasized the "socially isolating environment of the SMU in contrast to the general population—the near-daily cavity and strip searches; the confinement to a small cell for all sleeping and waking hours, aside from ten hours of activity outside the cell per month; the inability to socialize with other inmates; and the denial of educational, vocational, and therapy programs." Id. at 531. Next, the Fourth Circuit held that the plaintiff's 20-year "confinement to the SMU is extraordinary in its duration and indefiniteness." Id. (citing Wilkerson v. Goodwin, 774 F.3d 845, 855 (5th Cir. 2014)). The Fourth Circuit also held the severity of the first two factors were sufficient to establish an atypical and significant hardship even though the confinement to the SMU did not impact the plaintiff's sentence. Id. at 532.

### 4. Reyes's Has Pled Facts That Plausibly Allege That His Continued Confinement In Isolation Poses An Atypical And Significant Hardship

All three factors identified in Incumaa and Wilkinson support the plausible assertion in the Complaint that Reyes's confinement

47

in SM isolation constitutes an atypical and significant hardship. First, the restrictions of his confinement are severe. Like the plaintiff in Incumaa, Reyes is subject to a "severely restrictive and socially isolating environment . . . . [,] near-daily cavity and strip searches; the confinement to a small cell for all sleeping and waking hours, aside from [a few hours] of activity outside the cell per [week]; [and] the inability to socialize with other inmates." Id. at 531. Moreover, because of his isolation and inability to advocate for himself, Reyes contends "the actual conditions in . . . segregation are more onerous than those specified in the prison regulations." Beverati, 120 F.3d at 504. Specifically, it is said that, inter alia, correctional officers have denied Reyes recreation and showers for months at a time and often failed to feed him prescribed meals.

Second, Reyes has alleged facts plausibly asserting that his confinement in isolation as an SM inmate is indefinite. According to Reyes, his only method for escaping solitary confinement is through participation in the Step-Down Program, but his mental and linguistic limitations prevent him from participating in that program. The extraordinary length of Reyes's prolonged stay in isolation, in the absence of significant disruptive behavior, also supports the notion that his stay is indefinite.

Finally, Reyes has alleged facts plausibly asserting that his assignment to administrative segregation may have "collateral

48

consequences" on his sentence. See Incumaa, 791 F.3d at 530. "Because [] Reyes is serving time for an offense that occurred before January 1, 1995, he is eligible for 30 days of good conduct allowance for every [30 days served]. However, while he remains in solitary confinement VDOC policy prohibits him from earning the maximum amount of good conduct time allowed." Compl. ¶ 127 (internal citation omitted). Accordingly, Reyes has plausibly alleged that he has a protected liberty interest in avoiding continued solitary confinement as a SM inmate. See Williamson v. Stirling, 912 F.3d 154, 188 (4th Cir. 2018) (concluding "that convicted prisoners possess a liberty interest in avoiding solitary confinement" (citing Incumaa, 791 F.3d at 532)).

## 5. The Process Due

"[L]ongstanding Supreme Court jurisprudence [provides] that prison officials must engage in some sort of periodic review while an inmate is confined in administrative segregation, and that the officials' decision to continue such confinement must be supported by 'some evidence.'" Selby v. Caruso, 734 F.3d 554, 559 (6th Cir. 2013) (citing Harris v. Caruso, 465 F. App'x 481, 484 (6th Cir. 2012) (citing in turn Hewitt v. Helms, 459 U.S. 460, 477 n.9 (1983), and Superintendent v. Hill, 472 U.S. 445, 454 (1985)). The purpose of these periodic reviews is "to ensure that administrative segregation is not 'used as a pretext for indefinite [solitary] confinement.'" Williamson, 912 F.3d at 183 (quoting

49

<u>Hewitt</u>, 459 U.S. at 477 n.9). "Moreover, those periodic reviews must be <u>meaningful</u> enough to take into account the 'facts relating to a particular prisoner.'" <u>Id.</u> (emphasis added) (quoting <u>Hewitt</u>, 459 U.S. at 477 n.9.)

Defendants contend that, even if "Reyes possesses a protected liberty interest in avoiding continued confinement as a security level 'S' offender, VDOC policies establish constitutionally sufficient process." Mem. Supp. Mot. Dismiss 23. In support of this contention, Defendants note that, "[f]ollowing their assignment to security level 'S', inmates receive multiple internal and external, formal and informal, reviews." <u>Id.</u> at 24.[9]

Reyes does not suggest the prescribed levels of review are facially less than the Constitution requires. Mem. Opp'n Mot. Dismiss 36-38. Rather, he contends that, given that all the reviews were conducted in English, a language he does not understand, the reviews were not meaningful. See <u>Wolff v.</u> <u>McDonnell</u>, 418 U.S. 539, 570 (1974) (noting that additional procedural safeguards would be required to assist an illiterate prisoner at a disciplinary hearing); <u>Sandoval v. Holinka</u>, No. 09-CV-033-BBC, 2009 WL 499110, at *3 (W.D. Wis. Feb. 27, 2009)

_____

[9] Rather than challenging his initial placement in Security Level S, Reyes's due process claim focuses on Defendants' alleged failure "to provide meaningful proceedings to determine the continued propriety or necessity of [] Reyes'[s] solitary confinement." (Compl. ¶ 203.)

(observing that "if petitioner did not comprehend the proceedings or process he was subject to, then he was denied a meaningful opportunity to defend himself"); see id. (citing United States v. Johnson, 248 F.3d 655, 663 (7th Cir. 2001); United States v. Cirrincione, 780 F.2d 620, 634 (7th Cir. 1985); Clarkson v. Coughlin, 898 F. Supp. 1019, 1049-50 (S.D.N.Y. 1995); Bonner v. Ariz. Dep't of Corr., 714 F. Supp. 420, 425 (D. Ariz. 1989); Powell v. Ward, 487 F. Supp. 917, 932 (S.D.N.Y. 1980)). Further, Reyes contends that retaining him solitary confinement for failing to complete a program that he cannot comprehend (taking into account his lack of threat to institutional security and his deteriorating mental health) is a pretextual sham and does not comport with due process. See Selby, 734 F.3d at 560 (denying motion for summary judgment where material questions of facts existed as to whether inmate in prolonged segregation "actually received meaningful reviews, rather than sham reviews, as he contends" (quoting Williams v. Norris, 277 F. App'x 647, 649 (8th Cir. 2008))). If Reyes can prove what he has alleged, his due process claim will succeed. Because Reyes has stated a viable due process claim, Defendants' Motion to Dismiss Count II will be denied.

C. **ADA And Rehabilitation Act (Counts III & IV)**

In order to state a claim under either the ADA and or the Rehabilitation Act, a plaintiff must allege facts plausibly asserting that: (1) [he] has a disability, (2) [he] is otherwise

51

qualified to receive the benefits of a public service, program, or activity, and (3) [he] was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of [his] disability. Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005) (citing Baird v. Rose, 192 F.3d 462, 467-70 (4th Cir. 1999); Doe v. University of Md. Med. Sys. Corp., 50 F.3d 1261, 1264-65 & n. 9 (4th Cir. 1995)).

As pertinent here, the ADA defines a disability to mean "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(A). Reyes alleges that he suffers from serious mental illness, including severe depression, which interferes with his ability to care for himself, concentrate, think, and communicate. Baird, 192 F.3d at 467. Thus, Reyes has pled sufficient facts to establish the first element of his ADA claim.

With respect to the final two elements, Reyes alleges that he wishes to participate in the breadth of religious, recreational, and educational programs and activities available to inmates who are in general population. At this stage, Reyes has plausibly alleged that, in light of his recent disciplinary record, he is otherwise qualified to reside in general population.[10] Yet,

---

[10] "A plaintiff is 'qualified' if [he] is 'an individual with a disability who, with or without reasonable modifications to

52

because of his disability, he has not been allowed to, complete the Step-Down Program and move to general population. For example, although Clarke and Kiser were aware that "prisoners . . . with cognitive impairments, and serious mental health complications populate VDOC prisons and long-term solitary confinement units . . . [they] failed" to provide adequate accommodations, either through modification of the Step-Down program or other means, to allow such prisoners to progress to the general population. Compl. ¶¶ 168, 173. These allegations are sufficient to satisfy the second two elements for an ADA and Rehabilitation Act claim. See Constantine, 411 F.3d at 499. Further, because Reyes has adequately pled a constitutional violation, Defendants fail to articulate why his demands for monetary damages in conjunction with his ADA claims should be dismissed. See Chase v. Baskerville, 508 F. Supp. 2d 492, 506 (E.D. Va. 2007) ("[I]n the context of state prisons, Title II validly abrogates state sovereign immunity and 'creates a private cause of action for damages against the States' only 'for conduct that actually violates the Fourteenth Amendment.'" (quoting United States v. Georgia, 546 U.S. 151, 159 (2006))), aff'd, 305 F. App'x 135 (4th

---

rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.'" Constantine, 411 F.3d at 498 (quoting 42 U.S.C. § 12131(2)).

53

Cir. 2008). Accordingly, Defendants' Motion to Dismiss Counts III and IV for failure to state a claim will be denied.

## D. Equal Protection (Count V)

"The purpose of the [E]qual [P]rotection [C]lause . . . is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." King v. Rubenstein, 825 F.3d 206, 220 (4th Cir. 2016) (quoting Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)). Here, with respect to Count V(A),[11] Reyes alleges that:

> Defendants have been aware that [] Reyes and other prisoners with limited English proficiency need translation services to be able to meaningfully access the benefits of VDOC programs and services, including mental health evaluations and the Step-Down Program.
> Despite knowing that their policy and practice of not providing translation services has a disparate impact on limited English proficient prisoners, including by keeping them in solitary confinement longer than their English-speaking counterparts, Defendants acted intentionally, repeatedly, and with deliberate indifference by failing to provide access to translation services during mental health assessments, segregation review hearings and as part of the Step-Down Program, thereby excluding [] Reyes from participation in and denying him the benefits of VDOC services.

Compl. ¶¶ 226-27. Reyes contends that the "denial of language access was . . . a proxy for and evidence of intentional discrimination on [the] grounds of his national origin, i.e., his Central American origin." Mem. Opp'n Mot. Dismiss 46 (citations

---

[11] Defendants do not acknowledge Count V(B), much less offer any persuasive reason for its dismissal.

omitted). Other courts have accepted at the pleading stage that the failure to provide services in any language other than English may support an inference for intentional discrimination on the basis of national origin. H.P. v. Bd. of Educ. of City of Chicago, No. 18C621, 2019 WL 2103381, at \*9 n.8 (N.D. Ill. May 13, 2019) ("It is true that language ability per se is not the legal equivalent to a protected class like race or national origin, but language can sometimes serve as a proxy, or stalking horse, for discrimination against a protected class." (quoting EEOC v. Wis. Plastics, Inc., 186 F. Supp. 3d 945, 948 (E.D. Wis. 2016))).[12]

"[A] plaintiff seeking to establish a violation of equal protection by intentional discrimination may proceed in several ways . . . ." Pyke v. Cuomo, 258 F.3d 107, 110 (2d Cir. 2001) (citation omitted) (internal quotation marks omitted). First, he may allege facts that indicate that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). Defendants correctly note that Reyes has

---

[12] But see Mumid v. Abraham Lincoln High Sch., 618 F.3d 789, 795 (8th Cir. 2010) ("[Although federal law] prohibits discrimination on the basis of national origin, language and national origin are not interchangeable." (citing Hannoon v. Fawn Eng'g Corp., 324 F.3d 1041, 1048 (8th Cir. 2003); Soberal-Perez v. Heckler, 717 F.2d 36, 41 (2d Cir. 1983); Garcia v. Gloor, 618 F.2d 264, 268 (5th Cir. 1980))).

been treated the same as every other inmate in S custody—he was provided with services in English. This, however, is an argument that is too clever by half because those inmates are necessarily communicating in their native language. Reyes is not, and it is alleged that Defendants know that to be true. And, it is alleged that Defendants know that their subordinates make fun of Reyes, harass him, and deprive him of his basic rights because of his language and country of origin. That is enough to pass muster.

Second, a plaintiff also may establish a violation of equal protection by pointing to "a facially neutral policy that has an adverse effect and that was motivated by discriminatory animus." Pyke, 258 F.3d at 110. "A plaintiff alleging an equal protection claim . . . under a theory of discriminatory motivation underlying a facially neutral policy or statute, generally need not plead or show the disparate treatment of other similarly situated individuals." Id. at 108-09. Nevertheless, the plaintiff, in such a claim, must allege facts that indicate the challenged policy was "motivated by discriminatory animus and [its] application resulted in a discriminatory effect." Pyke v. Cuomo, 567 F.3d 74, 78 (2d Cir. 2009) (quoting Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev., 438 F.3d 195, 204 (2d Cir. 2006)). "Plaintiffs challenging such facially neutral laws on equal protection grounds bear the burden of making out a 'prima facie case of discriminatory purpose.'" Jana-Rock Const., Inc., 438

56

F.3d at 204 (citing Washington v. Davis, 426 U.S. 229, 241 (1976)).
"Discriminatory purpose, however, implies more than intent as
volition or intent as awareness of consequences. It implies that
the decisionmaker . . . selected or reaffirmed a particular course
of action at least in part because of, not merely in spite of, its
adverse effects upon an identifiable group." Pers. Adm'r of Mass.
v. Feeney, 442 U.S. 256, 279 (1979) (emphasis added) (footnote
omitted) (citation omitted) (internal quotation marks omitted).

In Village of Arlington Heights v. Metropolitan Housing
Development Corp., 429 U.S. 252 (1977), the Supreme Court addressed
a claim that racially discriminatory intent motivated a facially
neutral governmental action. In that case,

    the Court set forth a nonexhaustive list of factors to
    consider in making this sensitive inquiry. These
    include:  "[t]he  historical  background  of  the
    [challenged] decision"; "[t]he specific sequence of
    events leading up to the challenged decision";
    "[d]epartures from normal procedural sequence"; the
    legislative history of the decision; and of course, the
    disproportionate "impact of the official action—whether
    it bears more heavily on one race than another."

N.C. State Conference of NAACP v. McCrory, 831 F.3d 204, 220-21
(4th Cir. 2016) (alterations in original) (quoting Arlington
Heights, 429 U.S. at 266-67). "Challengers need not show that
discriminatory purpose was the 'sole[]' or even a 'primary' motive
for the legislation, just that it was 'a motivating factor.'" Id.
at 220 (quoting Arlington Heights, 429 U.S. at 265-66).

57

Certainly, the policy of providing all services in English "bears more heavily" on individuals, such as Reyes, who come from another country and do not speak English. Id. at 220-21 (quoting Arlington Heights, 429 U.S. at 266). Reyes, further alleges that Clarke knows that "the VDOC has a significant Spanish-speaking population," Compl ¶ 169, but that Clarke "failed to ensure that adequate interpretation services are available to prisoners of limited English proficiency and has failed to promulgate a language access policy . . . ." Id. Furthermore, Reyes alleges facts that, if proved, would permit a finding that the culture at Red Onion is not merely indifferent to Spanish speaking inmates, but instead, is actively hostile toward inmates of Central American origin. These alleged facts are sufficient to plausibly assert a viable claim of discriminatory intent. Accordingly, Defendants' Motion to Dismiss Count V(A) will be denied.

**E. Title VI (Count VI)**

"[P]rivate individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages." Alexander v. Sandoval, 532 U.S. 275, 279-80 (2001). "Section 601 of that Title provides that no person shall, 'on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity' covered by Title VI." Id. at 278 (quoting 42 U.S.C. § 2000d). "[I]t is . . . beyond dispute . . . that § 601 prohibits

only intentional discrimination." Id. at 280 (citation omitted). Defendants contends that Reyes has not plausibly asserted a claim of intentional discrimination. As explained, above Reyes has plausibly asserted a claim of intentional discrimination based on national origin. Methelus v. Sch. Bd. of Collier Cty., Fla., 243 F. Supp. 3d 1266, 1280 (M.D. Fla. 2017) (observing that "Title VI and equal protection claims are considered under the same analytical framework"). Accordingly, Defendants' Motion to Dismiss Count VI will be denied.

## F. Statute Of Limitations

Mathena contends that Count I, against him, is barred by the relevant statute of limitations. Clarke and Kiser contend that all of Counts III, IV, and VI are barred by the relevant statute of limitations. Count I and VI are governed by Virginia's two-year statute of limitations for personal injury claims. See DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018) (citing Va. Code § 8.01-243(A)); Guerrero v. Weeks, No. 1:13CV837 JCC/JFA, 2013 WL 5234248, at *3 (E.D. Va. Sept. 16, 2013) (citing Jersey Heights Neighborhoods Ass'n v. Glendening, 174 F.3d 180, 187 (4th Cir. 1999)), aff'd, 555 F. App'x 264 (4th Cir. 2014). Reyes's ADA and Rehabilitation Act claims, Counts III and IV, are subject to

a one-year statute of limitations.  A Soc'y Without A Name v. Virginia, 655 F.3d 342, 348 (4th Cir. 2011) (citations omitted).[13]

"The applicable statute of limitations begins to run once a claim accrues . . . ."  Id. (citing Cox v. Stanton, 529 F.2d 47, 50 (4th Cir. 1975)).  The claims at issue in this case generally accrue when a plaintiff "knows or has reason to know of the injury which is the basis of the action."  Id. (quoting Cox, 529 F.2d at 50).  "However, when a harm has occurred more than once in a continuing series of acts or omissions, a plaintiff under certain circumstances may allege a 'continuing violation' for which the statute of limitations runs anew with each violation."  DePaola, 884 F.3d at 486 (citing Nat'l Advert. Co. v. City of Raleigh, 947 F.2d 1158, 1166-67 (4th Cir. 1991)).  The continuing violation doctrine applies to claims under § 1983, the ADA, and the Rehabilitation Act.  See id. at 487; A Soc'y Without A Name, 655 F.3d at 347-48 (analyzing ADA claims under continuing violation doctrine and observing that "we apply the same substantive analysis to both the ADA and the Rehabilitation Act").

---

[13] Those ADA claims only made possible by the 2008 amendments to the ADA are subject to the federal four-year catch-all limitations period.  Latson v. Clarke, 249 F. Supp. 3d 838, 854 (W.D. Va. 2017) (citing Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382 (2004); Mercado v. Puerto Rico, 814 F.3d 581, 589 (1st Cir. 2016)).  While Reyes attempts to invoke this four-year limitation period, he fails to demonstrate that his ADA claims were only made possible by the 2008 Amendments to the ADA.  (Mem. Opp'n Mot. Dismiss 16.)

### 1. Eighth Amendment Claims Against Mathena

In DePaola, the Fourth Circuit stated that,

> a prisoner may allege a continuing violation under
> Section 1983 by identifying a series of acts or omissions
> that demonstrate deliberate indifference to a serious,
> ongoing medical need. The statute of limitations does
> not begin to run on such a claim for a continuing
> violation of a prisoner's Eighth Amendment rights until
> the date, if any, on which adequate treatment was
> provided.

DePaola, 884 F.3d at 487 (citation omitted). The Fourth Circuit

then explained that,

> to assert a Section 1983 claim for deliberate
> indifference under the "continuing violation" doctrine,
> a plaintiff must (1) identify a series of acts or
> omissions that demonstrate deliberate indifference to
> his serious medical need(s); and (2) place one or more
> of these acts or omissions within the applicable statute
> of limitations for personal injury.

Id. "A plaintiff's claim of a continuing violation may extend

back to the time at which the prison officials first learned of

the serious medical need and unreasonably failed to act." Id.

(citing Heard v. Sheahan, 253 F.3d 316, 318 (7th Cir. 2001)).

Here, Mathena served as Warden of Red Onion from October of

2011 until January of 2015. Compl. ¶ 21. "As warden, Defendant

Mathena was . . . directly responsible for decisions removing

prisoners from Level S (i.e., long-term segregation)

classification to a less restrictive security level." Id. ¶ 180.

After January of 2015, Mathena began working as the Security

61

Operation Manager for the VDOC, where he serves as the Chairman of the External Review Team. Id. ¶ 182. In that role,

> Defendant Mathena performs biannual reviews of each prisoner assigned to Red Onion at Security Level "S" (i.e., in solitary confinement) to determine if the prisoner should move out of solitary confinement. [] Reyes remains in solitary confinement due to Defendant Mathena's failure to perform a meaningful review of the necessity of [] Reyes'[s] continued isolation.

Id.

As explained above, Reyes has alleged facts that, if proved would establish that his prolonged isolated confinement as a Security Level S inmate "pose[s] a 'substantial risk' of serious psychological and emotional harm." Porter, 923 F.3d at 357 (citation omitted). Reyes has further alleged facts that indicate, that both as Warden of Red Onion and as Chairman of the External Review Team, Mathena, with knowledge of that risk, acted with deliberate indifference to that risk by maintaining Reyes in solitary confinement despite any penological necessity for doing so. Mathena fails to cite any authority for the proposition that the continuing violation theory should not apply because he changed jobs. Accordingly, the Court rejects Mathena's argument that the statute of limitations bars the Eighth Amendment claims against him for his role as warden in reviewing the need to maintain Reyes in solitary confinement.

## 2. ADA And Rehabilitation Act Claims

Clarke and Kiser contend that Reyes's ADA, Rehabilitation Act and Title VI claims are barred because as the applicable statute of limitations (one year for the ADA and Rehabilitation Act and two years for Title VI) began running in 2012 when Reyes entered the Step-Down Program and failed to receive accommodations for his mental disability or was discriminated against because of his national origin. Reyes counters that the continuing violation doctrine applies to save these claims pertaining to the Step-Down Program.

It appears that the critical unaddressed issue with respect to the statute of limitations for all these claims is whether Clarke and Kiser engaged in a discrete act of discrimination within the relevant limitation period. See Hill v. Hampstead Lester Morton Court Partners LP, 581 F. App'x 178 (4th Cir. 2014).

In Hill, Ms. Hill and her daughter, Ms. Mitchell, (collectively "Plaintiffs") rented a townhouse in a federally subsidized housing community in Baltimore, Maryland. Id. at 179. In 2004, Ms. Hill's leg was amputated below the knee, forcing her to use a wheelchair. Id. In June of 2004, Ms. Hill's physician sent the property manager a letter stating that Ms. Hill needed a ramp to access her apartment. Id. In response to that letter and other requests, over the next two years, Ms. Hill received assurances that a ramp would be installed during the upcoming

renovations in 2005 or that she would be transferred to a different apartment. Id. at 179-80. "Renovation concluded in October 2005, but Hill never received an offer to transfer to a new apartment" or the addition of a ramp to her townhouse. Id. at 180.

"In June 2006, Hill renewed her request for a wheelchair ramp or a transfer to a handicap-accessible unit." Id. In July of 2006, the landlord refused to provide any accommodation. Id.

On September 30, 2010, Hill's counsel sent the landlord a letter requesting that Plaintiffs' "townhouse be equipped with a wheelchair ramp and other structural modifications." Id. In November of 2010, the landlord responded and refused to provide any accommodations. Id. Thereafter, in February of 2012, Plaintiffs filed suit against the landlord under the Rehabilitation Act for failing to provide reasonable accommodations. Id. In Maryland, such a claim is subject to a three-year statute of limitations. Id.

The defendants moved for summary judgment on the ground that the claim was barred by the statute of limitations. Id. The defendants argued that Hill's claim accrued in July of 2006, when Hill was informed that the landlord would not be providing a ramp. Id. The defendants further asserted that any subsequent denial of accommodation amounted to requests to reconsider and did not restart the limitation period. Id. The district court agreed with the defendants' position and dismissed the action as barred

by the statute of limitations.  Id.  Hill appealed and the Fourth
Circuit reversed the district court's decision.  Id. at 180, 182.

The Fourth Circuit explained that:

When an individual engages in a series of acts each of
which is intentionally discriminatory, then a fresh
violation takes place when each act is committed.   In
those circumstances, [e]ach discrete discriminatory act
starts a new clock for filing charges alleging that
act. . . .  The existence of past acts and the
[plaintiff's] prior knowledge of their occurrence . . .
does not bar [a plaintiff] from filing charges about
related discrete acts so long as the acts are
independently discriminatory.   Thus, a plaintiff who
renews a request for a previously denied accommodation
may bring suit based on a new discrete act of
discrimination if the [defendant] again denies [the]
request and the subsequent denial carries its own,
independent limitations period.

Id. at 180-81 (alterations in original) (internal citations
omitted) (internal quotation marks omitted).   The Fourth Circuit
concluded that, "[b]ecause the November 2010 alleged failure to
accommodate constitutes a discrete act and occurred during the
three-year period immediately preceding the date on which
Plaintiffs filed suit, the district court erred in concluding that
it was time-barred."  Id. at 181 (emphasis added).

The Fourth Circuit, however, also rejected "Plaintiffs[']
attempt to breathe new life into their failure-to-accommodate
claims premised upon denials that occurred before February 2009
(three years before they filed suit) by arguing that the repeated
denials of their requests for accommodations constitute a

65

continuing violation that culminates within the limitation

period." Id. The Fourth Circuit noted

> The continuing-violation doctrine applies to claims
> based upon a defendant's ongoing policy or pattern of
> discrimination rather than discrete acts of
> discrimination. As explained above, a defendant's
> failure to accommodate constitutes a discrete act rather
> than an ongoing omission. Accordingly, the continuing-
> violation doctrine is inapplicable, and Plaintiffs'
> claims premised upon acts that predate the three-year
> limitations period are time-barred.

Id. (internal citations omitted).

Quite plainly under the above precedent, the timeliness of
Reyes's ADA and Rehabilitation Act claims turns on when Clarke and
Kiser refused to offer Reyes an accommodation and thus committed
a discrete act of discrimination. Similarly, any discrete act of
discrimination that fell with two years of the filing the Complaint
would render Reyes's Title VI claim timely. See Jersey Heights
Neighborhood Ass'n v. Glendening, 174 F.3d 180, 189 (4th Cir.
1999). Neither Clarke nor Kiser adequately addresses what
constituted the most recent discrete act of discrimination here.
Nor did Reyes. But it is the obligation of Clarke and Kiser to
get their point across and they did not do that. Accordingly, the
Court denies Clarke and Kiser's request to dismiss Reyes's ADA,
Rehabilitation Act, and Title VI claims as barred by the relevant
statute of limitations.

## V. CONCLUSION

Defendants' Motion to Dismiss (ECF No. 15) will be denied.

The Clerk is directed to send a copy of this Memorandum Opinion to counsel of record.

It is so ORDERED.

_____ /s/ REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August 2<u>9</u>, 2019